# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joseph A. Dickson |
| v. | : | Mag. No. 14-6605 |
| ABBE EDELMAN | : | CRIMINAL COMPLAINT |

I, Jason Annuziato, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Criminal Investigator with United States Attorney's Office, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

Jason Annuziato, Criminal Investigator
United States Attorney's Office

Sworn to before me, and
subscribed in my presence

May 12, 2014 at
Newark, New Jersey

HONORABLE JOSEPH A. DICKSON
UNITED STATES MAGISTRATE JUDGE          Signature of Judicial Officer

1

## ATTACHMENT A

### Counts One through Six
### (Wire Fraud)

On or about the dates set forth below, in Essex County, in the District of New Jersey and elsewhere, defendant

### ABBE EDELMAN

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises, and for purpose of executing and attempting to execute that scheme, did knowingly cause to be transmitted in interstate commerce the following writings, signs, signals, and sounds, each constituting a separate count of this Complaint:

| Count | Approximate Date | Description |
| --- | --- | --- |
| 1 | August 13, 2009 | Wire transfer of approximately $69,105 sent from VICTIM 2's bank account in New York to the bank account of Embassy Office Suites LLC in New Jersey, which defendant EDELMAN controlled |
| 2 | June 6, 2012 | Wire transfer of approximately $25,000 from the bank account of Classic Real Estate Appraisers LLC, d/b/a Regency Property Appraisers, in New Jersey, which defendant EDELMAN controlled, to the Florida bank account of VICTIM 6, a prior investor with the defendant, which included investment funds misappropriated from VICTIM 7 |
| 3 | September 20, 2012 | Wire transfer of approximately $515,000 sent from VICTIM 1's bank account in New York to the bank account of Regency Equity Partners, LLC in New Jersey, which defendant EDELMAN controlled |

| Count | Approximate Date | Description |
|---|---|---|
| 4 | September 28, 2012 | Wire transfer of approximately $25,000 from the bank account of Classic Real Estate Appraisers LLC, d/b/a Regency Property Appraisers, in New Jersey, which defendant EDELMAN controlled, to the Florida bank account of VICTIM 6, a prior investor with the defendant, which included investment funds misappropriated from VICTIM 1 |
| 5 | May 29, 2013 | Wire transfer of approximately $75,000 from VICTIM 3's bank account in New York to a personal bank account of defendant EDELMAN in New Jersey |
| 6 | November 5, 2013 | Wire transfer of approximately $400,000 from victims VICTIM 4 and VICTIM 5's bank account in New York to the bank account of Regency Real Estate Appraisers in New Jersey, which defendant EDELMAN controlled |

In violation of Title 18, United States Code, Sections 1343 and 2.

**ATTACHMENT B**

I, Jason Annuziato, a Criminal Investigator with the United States Attorney's Office for the District of New Jersey, having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

## Background

1. At all times relevant to this Complaint, defendant ABBE EDELEMAN was a resident of Livingston, New Jersey, who held himself out to be a real estate investor operating through several entities based in Essex County, New Jersey, which he controlled and which purported to engage in the buying, renovating and selling of real estate, including Classic Real Estate Appraisers, d/b/a Regency Property Appraisers; Embassy Real Estate Fund, LLC; Regency Equity Partners LLC; and Regency Equity Partners LLP (collectively the "Edelman Real Estate Companies").

## Overview of the Scheme to Defraud

2. Beginning at least as early as 2004 and continuing through the present, defendant ABBE EDELMAN engaged in a real estate investment fraud scheme, pursuant to which he fraudulently obtained, at least, approximately $4 million from victim-investors. Pursuant to the scheme, defendant EDELMAN made the following types of fraudulent misrepresentations, among others, to induce victim-investors:

    a. defendant EDELMAN told victim-investors that he had significant past real estate experience, including, among other things, a purported history of successfully buying and selling numerous bank foreclosed properties and an alleged MBA degree from NYU in real estate finance;

    b. defendant EDELMAN claimed to have earned millions of dollars in profits for past investors;

    c. defendant EDELMAN told victim-investors he had long standing relationships with banks that provided him with unique access to purchase bank foreclosed properties (the "Investment Properties") at below market prices;

4

d. defendant EDELMAN falsely claimed that he already had negotiated with the banks to purchase certain of the Investment Properties at agreed-upon prices that were below market price, which would guarantee an easy resale and profit for victim-investors;

e. defendant EDELMAN represented to victim-investors that their funds would be used for the purchase and renovation of specific Investment Properties in, among other places, New York, New Jersey, California, and Florida;

f. defendant EDELMAN further represented to victim-investors that the Investment Properties would be leased and/or sold, usually within a designated period of time – as little as eight to twelve months, and victim-investors would receive extraordinary returns – as much as approximately 25%; and

g. in some cases, defendant EDELMAN also misrepresented to victim-investors that he had: (i) received from other investors, including professional athletes and celebrities, the majority of the capital needed to purchase the Investment Properties; (ii) provided cash deposits to the financial institutions to secure the right to purchase the Investment Properties; and (iii) invested his own money in the deals.

3. Defendant EDELMAN's representations to victim-investors were false in material ways. Among other things, neither defendant EDELMAN nor any of the Edelman Real Estate Companies had a history of purchasing any bank foreclosed properties. Defendant EDELMAN did not even possess an undergraduate degree, let alone a graduate degree in real estate finance. More importantly, defendant EDELMAN did not have any deals lined up involving Investment Properties, did not have his own money invested in any such deals, and certainly did not have any money from celebrity investors invested in any purported deals. Indeed, defendant EDELMAN used little to none of the investors' monies to fund any real estate acquisitions or renovations, as was represented to them. Instead, defendant EDELMAN diverted the victim-investors' funds:

a. to fund his personal expenses, including his home mortgage and day-to-day living expenses, such as restaurants, telephone, and gas bills;

b. to purchase merchandise from high-end retailers such as Gucci, Nordstrom, and Neiman Marcus;

c. to repay existing investors, in Ponzi-scheme fashion; and

d. to pay his legal expenses in connection with, among other things, claims from victim-investors seeking repayment of their investment.

4. When victim-investors later inquired about the status of their investments, defendant EDELMAN offered additional misrepresentations, including fraudulent emails, falsely assuring victim-investors that he and his company had closed on the bank foreclosed properties, sometimes going so far as to represent that buyers for the properties already had been identified. Despite multiple requests from victim-investors for proof that the properties had, in fact, been purchased, defendant EDELMAN provided excuses why he could not provide them with the requested documentation.

5. In other cases, to allow the scheme to continue undetected, defendant EDELMAN made "lulling" payments to victim-investors in varying amounts, ranging from one hundred dollars to tens of thousands of dollars, to permit the scheme to continue undetected. When payments were made to any victim-investors, defendant EDELMAN generally represented that the source of the money was from the sale of the Investment Properties, and did not disclose that the money, in fact, came from a new victim-investor's investment.

### VICTIM 1's $515,000 "Investment"

6. In and around the summer of 2012, defendant EDELMAN fraudulently induced VICTIM 1 to invest with his company, Regency Equity Partners LLC, in a purported real estate portfolio consisting of eight bank foreclosed condominiums in Manhattan, New York.

7. Among other things, defendant EDELMAN falsely represented to VICTIM 1 that he had relationships with banks that afforded him the ability to purchase foreclosed properties from financial institutions, including Bank of America; that VICTIM 1's investment would be used solely for the purchase, renovation, and sale of the property portfolio; and that defendant EDELMAN had past success with the purchase and sale of six similar property portfolios.

8. To further induce VICTIM 1 to invest, defendant EDELMAN falsely claimed that he (a) had invested his own money into the property portfolio; (b) was short only $515,000 of the approximate $3.8 million investment needed to purchase the real estate portfolio; and (c) had received an investment from a former NBA all-star basketball player.

9. Defendant EDELMAN also provided VICTIM 1 with written materials, including a prospectus for the eight property portfolio, which contained multiple material misrepresentations, including:

    a. defendant EDELMAN had arranged for the purchase of the eight foreclosed properties from the bank at agreed-upon discounted prices, which would permit a quick and profitable resale for the investors;

   b. investor money would be used solely for the purchase, renovation, and sale of the specific properties included in the portfolio;

   c. Regency Equity Partners already provided cash deposits to the bank to buy the eight property real estate package;

   d. between February 2009 and November 2011, Regency Equity Partners had purchased and sold six similar property portfolios, consisting of over fifty foreclosed properties, which realized a profit of approximately 25%;

   e. defendant EDELMAN had graduated from New York University with an MBA in real estate finance; and

   f. based on past experience and comparable sales, Regency Equity Partners anticipated selling the current real estate portfolio in less than twelve months and generating more than 25% in profits.

  10. Based on these and other material false statements and omissions from defendant EDELMAN, on or about September 20, 2012, VICTIM 1 wired approximately $515,000 from his account in New York to an account in New Jersey that defendant EDELMAN designated.

  11. Contrary to his representations to VICTIM 1, defendant EDELMAN did not use VICTIM 1's money to fund any real estate venture. In fact, there is no evidence of either defendant EDELMAN, Regency Equity Partners, or any of the other Edelman Real Estate Companies ever purchasing any of the eight properties in the portfolio into which VICTIM 1 invested.

  12. Instead of using VICTIM 1's money for the promised purpose, defendant ABBE EDELMAN used VICTIM 1's $515,000 investment:

   a. to pay for personal expenses, including: mortgage payments on his personal residence and health insurance; day-to-day living expenses, including food and fuel; sizeable purchases for services and merchandise from high-end retailers and electronics stores, such as Gucci, Nordstrom, Neiman Marcus, and Best Buy; meals at restaurants; and trips to Las Vegas, including airfare and hotel accommodations at the Wynn Las Vegas Hotel; and

   b. to repay prior victim-investors.

  13. To date, defendant EDELMAN has repaid VICTIM 1 only a portion of his original investment, and with no interest or other return. More significantly those repayments to VICTIM 1 came only after continuous inquiries and demands from VICTIM 1, and only with monies from $575,000 in

investments that defendant EDELMAN fraudulently obtained from VICTIMS 4, 5, and 10 in and around November 2013.

## Other Fraudulent Transactions

14. Pursuant to the scheme described above, defendant EDELMAN also fraudulently solicited the following investments for purported transactions involving specific Investment Properties, but in reality misappropriated the victim-investors' funds:

    a. on or about August 13, 2009, in connection with an investment in the alleged purchase of a real estate portfolio consisting of ten bank foreclosed properties in Manhattan, New York, Dallas, Texas, and Miami, Florida, defendant EDELMAN caused VICTIM 2 to wire $69,105 from his bank account in New York to a bank account in New Jersey that defendant EDELMAN controlled;

    b. on or about May 29, 2013, in connection with an investment in the alleged purchase of a real estate portfolio consisting of eight bank foreclosed properties in Manhattan, New York, defendant EDELMAN caused VICTIM 3 to wire $75,000 from his bank account in New York to a bank account in New Jersey that defendant EDELMAN controlled; and

    c. on or about November 5, 2013, in connection with an investment in the alleged purchase of a real estate portfolio consisting of eight bank foreclosed properties in Manhattan, New York, defendant EDELMAN caused VICTIM 4 and VICTIM 5 to wire $400,000 from their bank account in New York to a bank account in New Jersey that defendant EDELMAN controlled.

15. Pursuant to the scheme described above, defendant EDELMAN engaged in multiple fraudulent transactions in which he repaid certain victim-investors with money he raised from other victim-investors without disclosing the diversion of funds to those investors, including the following:

    a. on or about June 6, 2012, defendant EDELMAN wired $25,000 from a bank account in New Jersey that he controlled to a bank account in Florida belonging to VICTIM 6, a former victim-investor in the alleged purchase of a real estate portfolio consisting of eight bank foreclosed properties in Manhattan, New York, and Miami, Florida, which $25,000 came from a $200,000 investment received from VICTIM 7 for the alleged purchase of a real estate portfolio consisting of eight bank foreclosed properties in Manhattan, New York; and

b.      on or about September 28, 2012, defendant EDELMAN wired $25,000 from a bank account in New Jersey that he controlled to VICTIM 6's bank account in Florida, which $25,000 came from the VICTIM 1's $515,000 investment discussed above.

### Among defendant EDELMAN's Efforts to Conceal the Fraud

16.     To conceal his fraudulent conduct, beginning in or about December 2012 and continuing through at least May 2013, defendant EDELMAN sent or caused to be sent to VICTIM 8 multiple emails from a purported Bank of America representative in California named "Stephen Meyers," regarding the status of certain bank foreclosed real estate transactions. The emails were intended to make it appear as if defendant EDELMAN actually had been negotiating deals with Bank of America. VICTIM 8 passed the information on to VICTIMS 1 and 7, who invested in the same property deal as VICTIM 8. The emails, however, were fraudulent and originated from an email account that defendant EDELMAN had created or had caused to be created, stephenpmeyers@[PROVIDER REDACTED].com (the "S.M. Email Account"). Indeed, the S.M. Email Account was created from an IP Address in New Jersey (not California) associated with defendant EDELMAN.

17.     The bogus Emails that Victim 8 received from the S.M. Email Account included the following, among others:

a.      an email dated January 15, 2013, copying defendant ABBE EDELMAN, which read, in part, as follows:

> Hi Guys, It has been a long two weeks here at B of A. The following properties we got final clearance to close on about an hour ago: [listing six of the eight properties from the portfolio into which VICTIM 8 invested]. These two units are holding us up: [listing two units of the eight properties from the portfolio into which VICTIM 8 invested] . . . due to FED REGS we have to close all of these eight units together . . . . I assure you that all of these units will be closed on to Regency Equity Partners shortly. . . . Steve

b.      an email dated February 1, 2013, copying defendant EDELMAN, which read, in part, as follows:

> [T]he deeds are all executed and headed back to you guys. All of the keys were located finally and the FEDEX tracking number is 802251508782.

    c. an email dated February 5, 2013, copying defendant EDELMAN, which read, in part, as follows:

> Tracking number from Tampa which contains the deeds is 8022-5150-8613. All is signed and executed. You will have that in 24 hours. . . . Believe it or not . . . we might have an external vendor/investor that will take this entire package off of your hands for a very handsome profit. 40% range.

    d. an email dated February 21, 2013, copying defendant EDELMAN, which read, in part, as follows:

> We work hand and hand with a large hedge fund out here. And they want to buy all of the eight (8) units from both of you with close to a 45% turn key profit back to you guys and you will have no broker fees[.] . . . If you do not want the deal, keys will be sent out the day you decide it is not for you. We are not holding the keys hostage and if you decide not to do the deal we will also pay the additional holding costs for the delay on our end.

    e. an email dated May 20, 2013, copying defendant EDELMAN which read, in part, as follows:

> I just checked and the error about the 15% [deposit from the investors] was mine . . . . The delay though is common when funds are transferred between multiple parties. You are right that they did say the funds were being distributed 2 weeks ago, but that is the red tape involved.

   18. In addition to the fraudulent S.M. Email Account, on or about May 29, 2013, defendant EDELMAN provided to VICTIM 8 a California telephone number for Stephen Meyers. The subscriber information for the Meyers telephone number revealed, however, that the telephone number was for a prepaid telephone activated on or about May 29, 2013, the same day that defendant EDELMAN provided the number to VICTIM 8, by a company associated with defendant EDELMAN.

**Recorded Conversations and Admissions**

19. On some occasions, victim-investors recorded their conversations with defendant EDELMAN, who admitted to or acknowledged his fraudulent scheme to them. For example, in and around December 2010, in a recorded conversation with VICTIM 9, the following exchange took place in which defendant ABBE EDELMAN admitted that no properties were purchased with the money that VICTIM 9 had invested with defendant EDELMAN:

VICTIM 9: "Nothing was purchased in actuality."

Defendant EDELMAN: "Right."

. . .

VICTIM 9: "It wasn't."

Defendant EDELMAN: "Right."

20. In and around April 2014, in a recorded conversation with VICTIM 3, in response to a request from VICTIM 3 to "come clean," defendant EDELMAN made the following admissions at several different points during the recording:

    a. "I told you that I misappropriated funds;"

    b. "I told you that I misappropriated the funds;"

    c. "I told you the truth is that I misappropriated funds;" and

    d. "I don't know legally what I have because I misappropriated funds with other people."